UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X
SHERYL ORLIK, individually and on          :     08 Civ. 1213 (WCC)
behalf of JARED ORLIK, minor child,
                                           :     **ECF CASE**

                    Plaintiffs,
                                           :

          - against -                      :     **OPINION**
                                           :     **AND ORDER**

DUTCHESS COUNTY, STATE OF NEW YORK,
ROBERT B. ALLERS, in his capacity as       :
Commissioner of Social Services, ASHLEY
TILTON, individually and as Caseworker, :
ANN WOOSLEY, individually and as
Supervisor, NETTER E. THOMAS,              :
individually and as Caseworker, DAVID
GARCIA, individually and as Supervisor, :
IRENE MAGALSKI, individually and as
Deputy Commissioner, all of the            :
Dutchess County Department of Social
Services and DUTCHESS COUNTY DEPARTMENT     :
OF SOCIAL SERVICES,
                                           :

                    Defendants.    :
- - - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                                   LAW OFFICES OF DANIEL L. PAGANO
                                   **Attorneys for Plaintiffs**
                                   2649 Strang Boulevard, Suite 104
                                   Yorktown Heights, New York 10598

DANIEL L. PAGANO ESQ.
RICHARD ST. PAUL, ESQ.

          Of Counsel

                                   McCABE & MACK LLP
                                   **Attorneys for Defendants**
                                   63 Washington Street
                                   P.O. Box 509
                                   Poughkeepsie, NY 12602

DAVID LEWIS POSNER, ESQ.
KAREN F. LESPERANCE, ESQ.

          Of Counsel

                                   **Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff, Sheryl Orlik, individually and on behalf of her son, Jared Orlik ("Jared"), sues Dutchess County, State of New York; Robert B. Allers ("Allers"), in his capacity as Commissioner of Social Services; Ashley Tilton ("Tilton"), individually and in her capacity as case worker; Ann Woolsey ("Woolsey"), individually and in her capacity as supervisor; Netter E. Thomas ("Thomas"), individually and in her capacity as case worker; David Garcia ("Garcia" and, together with Allers, Tilton, Woolsey and Thomas, the "individual defendants"), individually and in his capacity as supervisor; and the Dutchess County Department of Social Services ("DSS" and, together with Dutchess County, State of New York and the individual defendants, the "defendants")[1].  Plaintiff sues under 42 U.S.C. § 1983, alleging various claims arising out of defendants' allegedly wrongful removal of Jared from the custody of plaintiff.  Defendants now move for summary judgment, on the ground that the individual defendants are entitled to qualified immunity.  For the reasons stated herein, defendants' motion is granted with respect to Tilton, Woolsey, Thomas and Garcia and considered moot with respect to Allers.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

At all times relevant to this suit, Allers was the Commissioner of DSS; Thomas was a case worker at the Child Protective Services Unit ("CPS") of DSS and assigned to investigate a report of abuse or maltreatment of Jared; Garcia was a CPS case supervisor and Thomas's direct supervisor;

---

[1]  Plaintiff also sued Irene Magalski, individually and in her capacity as Deputy Commissioner of DSS.  The parties have since agreed to a stipulation of discontinuance of all claims against Magalski, which stipulation was so ordered by this Court on March 13, 2009.

Tilton was a case worker at the Foster Care Unit ("FCU") of DSS and assigned to Jared's case; and Woolsey was an FCU case supervisor and Tilton's direct supervisor. (Defs. R. 56.1 Stmt. ¶¶ 1-6.)

Jared was born at 35 weeks gestation on January 30, 2005 at Vassar Brothers Hospital (the "Hospital") in Poughkeepsie, New York. (*Id*. ¶¶ 7-8.) At that time, he was placed in the neonatal intensive care unit, where he remained until February 11, 2005. (*Id*. ¶¶ 8-9.) From February 11, 2005 to February 15, 2005, Jared was kept in the Hospital's "well baby nursery." (*Id*. ¶ 9.)

On February 3, 2005, the New York State Central Registry for Child Abuse and Maltreatment received a report from Andrea Pesavento ("Pesavento"), an employee of the Hospital, regarding plaintiff, which report stated that:

> Mother appears overwhelmed with chronic pain, pre-occupied with her craving for medication, and unprepared for meeting the needs of her newborn son; consequently, there is a concern that Jared is at risk of harm in mother's care.
> Mother has been "vague and evasive" in answering sources questions. Mother has complained about headache and chronic pain and she has asked for particular medication to treat her pain; she has been examined by multiple specialists and medical findings are inconclusive. Mother has not notified Jared's father about his birth. Jared was born at 35 weeks gestation; he will remain in neo-natal unit until next week.

(*Id*. ¶ 10.) On February 15, 2005, Pesavento filed a report directly with DSS, in which she noted that medical staff from the Hospital expressed "concerns that [plaintiff] displayed 'drug seeking' behavior and had concerns about her providing for her newborn." (*Id*. ¶ 11.)[2]

On February 3, 2005, Garcia was the "supervisor on call to receive Central Registry referrals" and "[h]e assigned the investigation of the [Hospital] report to [] Thomas." (*Id*. ¶ 12.) Thomas then

---

[2] Plaintiff avers that no individual stated that he or she "personally observed 'drug seeking behavior'" and, further, that the term "drug seeking behavior" is "vague and conclusionary." (Pls. R. 56.1 Counterstmt. ¶ 11.)

carried out an investigation, pursuant to which she learned that Dr. Benjamin Abastillas, a psychiatrist, had a consultation with plaintiff on February 1, 2005, while plaintiff was hospitalized, from which consultation Dr. Abastillas had "'questions about [plaintiff's] ability to care for her newborn infant,'" felt that she was "'evasive and self-contradictory'" and suspected "'drug seeking behavior.'"[3]   (*Id.* ¶ 13.)   Thomas also learned that, on February 1, 2005, plaintiff had a pain consultation with an anesthesiologist, who noted that she had "'15-20 ER visits c/o HA always requesting Demerol'" and also noted that she was currently on a "Duragesic Patch." (*Id.*)   Thomas also spoke with Denise Bolds ("Bolds") of MVP, plaintiff's insurance carrier, from whom Thomas learned that plaintiff had made two emergency room visits to Benedictine Hospital in Kingston, New York and several other emergency room visits to Vassar Brothers Hospital.  (*Id.* ¶ 14.)  Bolds also told Thomas that plaintiff "had been advised to obtain a primary care physician to manage her pain issues, she went to the emergency room frequently complaining of migraines and would request Morphine and that she was not in compliance with the advice of her OB/GYN, Dr. [Dean] Bloch."[4] (*Id.* ¶¶ 15, 17.)

Thomas also "obtained correspondence and records from [the Hospital] with respect to [plaintiff's] numerous visits to its emergency room during her pregnancy."  (*Id.* ¶ 16.)  Those correspondence and records revealed the following: (1) on August 20, 2004, plaintiff complained

---

[3]  Plaintiff states that Dr. Abastillas woke plaintiff from her sleep, questioned her for approximately five minutes and that there is "no evidence that such 'consult' could or should have formed the basis for any opinion by the defendants or any court regarding the plaintiff or her actually [sic] ability to care for [Jared]." (Pls. R. 56.1 Counterstmt. ¶ 13.)

[4]  "Plaintiff challenges the relevance of what her insurance [carrier] alleges" and avers that defendants' statement that she was "seeking Morphine" contradicts defendants' earlier statement that she "always requested 'Demerol.'" (Pls. R. 56.1 Counterstmt. ¶ 15.)

of a migraine headache and toothache and was given Demerol; (2) on August 31, 2004, plaintiff complained of a migraine headache and vomiting and was given Demerol and advised to follow up with the Hospital's OB/GYN clinic; (3) on September 17, 2004, plaintiff complained of a migraine headache "since [that] morning," was given Demerol and was advised to follow up with her doctor if she had further problems; (4) on September 20, 2004, plaintiff complained of a migraine headache, neck pain and nausea, was given Demerol and advised to follow up at the Hospital's clinic and with a neurologist; (5) on September 22, 2004, plaintiff complained of "migraine and jaw pain since 'this AM,'" was given Demerol and told to "'follow up with primary'"; (6) on October 3, 2004, plaintiff complained of migraines "since AM" with abdominal pain, was given an initial shot of Demerol and a second shot one hour later "after reporting no relief," and was also referred to her OB/GYN physician, Dr. Herde, who was Dr. Bloch's partner and who had, one month earlier, "warned her to limit her narcotic use and had given her a prescription for Percocet"; (7) on October 24, 2004, plaintiff complained of a headache "since AM" and was given "an initial IV of Demerol and then[,] two hours later[,] a second IV"; (8) on October 26, 2004, plaintiff went to the emergency room "with complaints of tooth pain wanting 'pain relief,'" the hospital record notes that she was "a pregnant Demerol user; informed that [the Hospital] cannot facilitate her analgesic needs due to her pregnancy and possible SE on fetus . . . [p]atient is offered Vidocaine and injected locally"; (9) on December 4, 2004, plaintiff complained of a migraine headache "since this am," and received Demerol; (10) on December 6, 2004, plaintiff complained of a "migraine and neck pain," the "ER staff noted that she was 'well known to ED,'" and she was given Demerol and Percocet; (11) on January 7, 2005, plaintiff went to the emergency room complaining of a "migraine with jaw and neck pain," she was given Demerol and told to follow up with her personal physician and a neurologist; (12) on January

4

22, 2005, plaintiff went to the emergency room complaining of a migraine headache with vomiting, she was given Demerol and Hospital staff discussed with plaintiff "issues of narcotic treatment in pregnancy including possible PTC and post-partum withdrawal by fetus. Patient is aware of risks and requests narcotics despite risks. Will give low dose Demerol/Phenergan if patient can procure a ride home." Before leaving, plaintiff told the Hospital staff that she wanted additional medication because her pain "remained"; (13) on February 6, 2005, which was six days after the birth of Jared, plaintiff "went to the emergency room complaining of a migraine headache and she received an initial dose of Demerol and then a second before leaving." (*Id.*)

Defendants aver that Thomas, in connection with her investigation, spoke with Dr. Bloch and obtained records from him; however, plaintiff "denies that [] Thomas spoke with Dr. Bloch before the removal of [] Jared." (*Id.* ¶ 17; Pls. R. 56.1 Counterstmt. ¶ 17.) According to Dr. Bloch, plaintiff came to his practice prior to Jared's birth, on August 30, 2004 for a "'consult to see if she would like our practice.'" (Defs. R. 56.1 Stmt. ¶ 18.) Dr. Bloch avers that, during that visit, she inquired about "'Tylenol 3's for pain relief.'" (*Id.*) Dr. Bloch's chart also reflects that his staff "'discussed office policies [with plaintiff] - Narcotic pain relief definitely not recommended for chronic conditions [without] expectation of resolving soon. Strongly advise - getting a PCP[5] who can COORDINATE all health issues and work [with] us in pregnancy care.[']" (*Id.* ¶ 19 (emphasis in original).) Plaintiff returned to Dr. Bloch on September 2, 2004 and was seen by Dr. Christine Herde, whose records reflect that she "'[d]iscussed plan for pregnancy [with plaintiff] and that narcotic usage must be limited. Plan to develop agreement to only use approx. 3 to 4 pills daily at maximum." (*Id.* ¶ 20.) According to defendants, Dr. Bloch also advised Thomas that "he was not in agreement with

---

[5] We assume that a "PCP" refers to a primary care physician.

[plaintiff's] behavior and that he wanted her to get a primary care physician but she failed to do so. He also disagreed with her constant visits to the emergency room."[6] (*Id*. ¶ 21.)  Dr. Bloch also sent a letter to Thomas concerning plaintiff, in which letter Dr. Bloch expressed "concerns about [plaintiff's] need for pain medicine and the strong possibility of addictive behavior."[7]  (Defs. Mot. Summ. J., Ex. X.)

Pursuant to her investigation, Thomas "also checked the Town of Poughkeepsie police records" and learned that Jesse Russel, Jared's father, had "kicked [plaintiff] in the back and had kicked her in the stomach [on January 22, 2005,] when she was five months pregnant."  (Defs. R. 56.1 Stmt. ¶ 23 (citing Defs. Mot. Summ. J., Ex. Y).)  Defendants state that, "[d]espite this history, [plaintiff] listed [] Russell on the [Hospital] emergency room form as either her primary contact or spokesperson."  (Defs. R. 56.1 Stmt. ¶ 24.)

Thomas also made an unannounced visit to plaintiff's home during the course of Thomas's investigation.  (Defs. Mot. Summ. J., Ex. H at 3.)  Thomas's report reflects that, during that visit, plaintiff "stated that Dr. Bloch gave her pain medication once and a lady Dr. gave her pain medication once," that, at present, "she was taking . . . Vicodyn" and that, when asked "if she took

---

[6]  Plaintiff "[does] not believe [] Thomas is truthful regarding her interactions with Dr. Bloch's office" and states that Thomas's "notes [are] not in compliance with Department policy."  (Pls. R. 56.1 Counterstmt. ¶ 21 (citing Pls. Mem. Opp. Summ. J., Ex. 5 (Thomas Dep.) at 121-31).)  We have reviewed the portion of the record that plaintiff cites, however, and it is unclear as to which policy plaintiff refers and how Thomas's notes were improper.

[7]  Defendants state that Dr. Bloch sent this letter to Thomas via facsimile on February 22, 2005 (Defs. R. 56.1 Stmt. ¶ 22), however the letter bears neither a date nor any confirmation time/date stamp of transmission.  Plaintiff avers that "Dr[.] Bloch did not sign or write the memo faxed . . . [and that it] [a]ppears [that] the memo is based upon information provided to Dr.[]Bloch's staff by [] Thomas."  (Pls. R. 56.1 Counterstmt. ¶ 22.)  The Court notes that the letter bears a signature purported to be that of "Dean Bloch MD."  (Defs. Mot. Summ. J. Ex. X.)

Vicodyn during the time she was pregnant," plaintiff said that she did not.[8]  (*Id.*)  Defendants aver

that "[Hospital] records revealed that [plaintiff] was currently taking Ativan, Percocet and wore a

fentanyl patch" and that "[e]mergency [r]oom records . . . documented [plaintiff's] continued receipt

of Demerol at each emergency room visit during her pregnancy[,] which she did not acknowledge

when asked about drug use during her pregnancy."  (Defs. R. 56.1 Stmt. ¶¶ 26-27.)  Thomas also

spoke to plaintiff's mother, Angela Orlik, who "stated that she yells at her [daughter, plaintiff] about

her drug use."  (Defs. Mot. Summ. J., Ex. H at 3.)  Angela Orlik disputes this portion of Thomas's

report and states that "[t]he allegation that [she] yelled at [her] daughter about her drug use is not

true."  (A. Orlik Aff. ¶ 2.)

Thomas and her supervisor, Garcia, decided that they had obtained enough information to

request that DSS "file a petition seeking temporary removal of Jared."  (Defs. R. 56.1 Stmt. ¶¶ 30-

31.)  "It is [DSS] that brings the [temporary removal] proceeding, not the individual assigned

caseworker or individual case supervisor."[9]  (Allers Aff. ¶ 7.)  "In this case[,] the matter was

reviewed by counsel [for DSS] and discussions were also held with [] Magalski, the Deputy

---

[8]  Plaintiff disputes the contents of this report.  She states that she "never denied the use of medication during her pregnancy nor did she state [that] she only ingested two prescriptions given to her by Dr. Bloch's office . . . [and that she] properly informed [] Thomas [of] what medications she was prescribed by the hospital."  (Pls. R. 56.1 Counterstmt. ¶ 25.)  Plaintiff's affidavit supports her statement.  (*See* S. Orlik Aff. ¶ 8.)

[9]  Plaintiff appears to dispute this statement, arguing that the affidavit in support of the this statement, according to plaintiff, the Thomas Delpizzo Affidavit, does not state the affiant in fact reviewed the matter.  (Pls. R. 56.1 Counterstmt. ¶ 32.)  The affidavit that defendants cite, however, is the Allers affidavit, which affidavit plaintiff does not appear to claim is improper for consideration.

Commissioner, and Ms. Bonnerworth, the head of the Children's Services Unit."[10]   (Defs. R. 56.1 Stmt. ¶ 33.)  Defendants aver that, after the matter was reviewed, "the decision was made to proceed to court and [] Thomas's affidavit and the supporting petition were prepared and brought to [] Allers for final review and signature"[11] because Allers, as the Commissioner of DSS, is the individual designated under DSS policy to sign all petitions.  (*Id*. ¶¶ 34-35.)  Allers neither directly participated in nor supervised this case; rather, he relied on the "expertise and thoroughness of staff of CPS and supervisors and the review by counsel."  (*Id*. ¶¶ 36-37.)

On February 10, 2005, DSS sent a letter, via facsimile transmission, to the Hospital, wherein DSS stated that "[it was] placing an administrative hold on [Jared] . . . [and] requesting that the child not be released[] from the [H]ospital at this time, even if he has been medically cleared."  (*Id*. ¶ 38; Defs. Mot. Summ. J., Ex. Z.)  Also on February 10, 2005, DSS filed a "petition for temporary removal of Jared pursuant to [the] Family Court Act § 1027 and supporting affidavit of [] Thomas . . . with the Dutchess County Family Court" (the "Family Court").  (Defs. R. 56.1 Stmt. ¶ 40.)  A hearing before the Family Court commenced at 4:15 p.m. on that day (the "February 10 Hearing").  (*Id*. ¶ 41.)  Plaintiff was present at that hearing and had consulted with counsel, however, counsel was not present and plaintiff avers that she "did not have a meaningful opportunity" to consult with counsel.  (*Id*. ¶ 42; Pls. R. 56.1 Couterstmt. ¶ 42.)  The February 10 Hearing resulted in the Family Court issuing an order granting temporary custody of Jared to DSS.  (Defs. R. 56.1 Stmt. ¶ 43.)

---

[10]  Plaintiff does not dispute this, however, she notes that defendants do not "state[] what specific facts [these individuals] review[ed] and what comments or opinions they reached and what recommendations they made."  (Pls. R. 56.1 Counterstmt. ¶ 33.)

[11]  Plaintiff states that "there is no evidence offered by the defendant[]s as to who decided to place[] the administrative hold and why such was done prior to the actual receipt of the removal order."  (Pls. R. 56.1 Counterstmt. ¶ 34.)

On February 23, 2005, plaintiff, through her counsel, "demanded a hearing pursuant to FCA § 1028 seeking return of Jared." (*Id*. ¶ 44.) At a Family Court proceeding on February 25, 2005, plaintiff's "request for a hearing seeking return of Jared" was withdrawn and the record of that proceeding reflects that "[i]t's been agreed that [Jared] will be placed with a relative foster parent . . . a cousin." (*Id*. ¶ 45-46; and Defs. Mot. Summ. J., Ex. EE at 2.) Plaintiff, however, states that she "never consented at any time to foster care for [Jared] and objected at all times." (S. Orlik Aff. ¶ 22.) On February 25, 2005,[12] the Family Court issued an order directing plaintiff to undergo a substance abuse evaluation at "Lexington Center." (Defs. R. 56.1 Stmt. ¶ 47.)

In a hearing before the Family Court on May 4, 2005, after DSS "filed an amended petition supported by an additional affidavit of [] Thomas," plaintiff's counsel advised the Family Court that "he would renew his application for a § 1028 hearing seeking the return of Jared" to plaintiff, however, that application was never filed. (*Id*. ¶¶ 48-49.) In a Family Court proceeding on May 25, 2005, plaintiff's counsel,[13] DSS's counsel and the law guardian representing Jared agreed to "meet on June 3rd to discuss the case and its possible resolution." (*Id*. ¶ 51.) No request for a hearing was made at that time and the order that was entered pursuant to the February 10 Hearing, granting temporary custody of Jared to DSS, continued unchanged. (*Id*. ¶ 52.) At the next proceeding before the Family Court, which took place on June 15, 2005, plaintiff's counsel "verbally demanded a § 1028 hearing within three days[,] but the [Family] Court indicated [that] it could not do this and

---

[12] Defendants state that this Family Court proceeding occurred on February 25, *2008*, however, in light of the other dates and the record as a whole, we assume that defendants intended to state that the Family Court proceeding occurred on February 25, *2005*.

[13] At this proceeding, plaintiff was represented by new counsel, who was substituted for her previous counsel. (*Id*. ¶ 50.)

9

scheduled trial for August." (*Id*. ¶ 53.) As of June 30, 2005, plaintiff's counsel "had filed a request for a § 1028 hearing seeking the return of Jared." (*Id*. ¶ 56.) Subsequent Family Court proceedings, on July 5, 2005 and July 7, 2005, did not result in resolution of the custody issues. (*Id*. ¶¶ 57-58.)

On July 12, 2005, the Family Court issued a "Multi-Purpose Order on Consent," providing for a graduated increase in the length of plaintiff's visits with Jared, with a full "return of the child to the mother by July 26, 2005." (*Id*. ¶ 60; Defs. Mot. Summ. J., Ex. PP at 1.) The Multi-Purpose Order on Consent "required [plaintiff] to cooperate with 'DSS caseworkers, [p]ublic [h]ealth nurse, [e]arly [i]ntervention specialists' and other agencies. [Plaintiff] also agreed to continue her 'intensive counseling program,' domestic violence counseling if recommended and submit to random drug tests." (Defs. R. 56.1 Stmt. ¶ 61 (citing Defs. Mot. Summ. J., Ex. PP at 1).) Plaintiff was granted full custody of Jared on July 26, 2005. (Defs. R. 56.1 Stmt. ¶ 62.)

On February 22, 2006, DSS "offered to conclude the matter [before the Family Court] with a three[-]month adjournment in contemplation of dismissal," which offer plaintiff did not accept. (*Id*. ¶ 64.) The Family Court adjourned the matter until March 15 "to determine if the parties could reach agreement on the form of an ultimate disposition." (*Id*. ¶ 67.) On March 15, 2006, the Family Court dismissed DSS's petition in the interest of justice. (*Id*. ¶ 68.) Pursuant to an administrative hearing on October 4, 2006, the "indicated report" against plaintiff was expunged. (*Id*. ¶ 75.)

## DISCUSSION

### I.   Legal Standard for Summary Judgment

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based on that fact, a reasonable

jury could find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 248. The burden rests on the

movant to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).  In deciding whether summary judgment is appropriate, the Court resolves all

ambiguities and draws all permissible factual inferences against the movant.  *See Anderson*, 477 U.S.

at 255.  To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more

than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court's role at this stage of the

litigation is not to decide issues of material fact, but to discern whether any exist.  *See Gallo v.*

*Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Nevertheless, as one court

explained:

> [S]ummary judgment must be granted against a party in instances
> when such party fails to adequately establish an essential element on
> which it bears the burden of proof. . . .  The non-moving party may
> not rest upon unsubstantiated allegations, conclusory assertions or
> mere denials of the adverse party's pleading, but must set forth and
> establish specific facts showing that there is a genuine issue for trial.
> . . .  A metaphysical or other whimsical doubt concerning a material
> fact does not establish a genuine issue necessitating a trial. . . .  The
> mere existence of a scintilla of evidence supporting the non-movant's
> case is insufficient to defeat a motion for summary judgment.

*Brooks v. Di Fasi*, 1997 U.S. Dist. LEXIS 11162, at *6-7 (W.D.N.Y. July 30, 1997) (internal

quotation marks and citations omitted).

## II.   <u>Legal Standard for Qualified Immunity</u>

The doctrine of qualified immunity shields government agents from liability for their official

11

actions, unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Almonte v. City of Long Beach*, 478 F.3d 100, 110 (2d Cir. 2007). An official is entitled to qualified immunity where: (1) the plaintiff has not alleged a violation of a constitutional right; (2) the right was not clearly established at the time of the conduct; or (3) the official's actions were not objectively unreasonable in light of clearly established law.[14]  *Harlow*, 457 U.S. at 818. Qualified immunity is "an entitlement not to stand trial or face the burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Second Circuit has recognized that social service workers must balance competing rights and concerns in deciding whether to remove a child from the custody of his parents. *van Emrik v. Chemung County Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990).

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services case workers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever

---

[14] In *Saucier v. Katz*, the Supreme Court held that qualified immunity requires a two-step inquiry, first, "whether the facts, taken in the light most favorable to the party asserting an injury, show a violation of a constitutional right" and, second, "whether the constitutional right was 'clearly established' such that '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005), quoting *Saucier*, 533 U.S. 194, 201-06 (2001) (alterations in original). However, the Supreme Court recently held that "the *Saucier* procedure should not be regarded as an inflexible requirement" and that while the order of the two-step inquiry set forth in *Saucier* is often appropriate, it "should no longer be regarded as mandatory." *Pearson v. Callahan*, 129 S. Ct. 808, 812, 818 (2009). In other words, courts may exercise discretion in determining which of the two prongs of the qualified immunity analysis to address first.

way they make it.

*Id*.  In child removal cases, "[t]he issue is not whether it was absolutely essential to remove the child

. . . [t]he issue is whether it was objectively reasonable for the defendants to make the decision they

made."  *Id*.  "If caseworkers '"of reasonable competence could disagree" on the legality of [a]

defendant's actions,'" then such defendant will be entitled to qualified immunity.  *Tenenbaum v.*

*Williams*, 193 F.3d 581, 605 (2d Cir. 1999) (alteration in original) (internal citation omitted).


### A.    Robert B. Allers

The "personal privilege . . . of . . . qualified immunity . . . [is] available to governmental

officials only with respect to damage claims asserted against them in their individual capacities."

*Pinaud v. County of Suffolk*, 52 F.3d 1139, 1146 (2d Cir. 1995); *see also Ying Jin Gan v. City of New*

*York*, 996 F.2d 522, 529 (2d Cir. 1993) (A finding that a plaintiff sues a defendant only in the

defendant's official capacity "obviate[s] the need for analysis of [defendant's] claims of absolute or

qualified immunity, *i.e.*, privileges that are available only in defense of individual-capacity claims.").

The First Amended Complaint specifies that Allers is sued "in his capacity as Commissioner

of Social Services," whereas each other named defendant is sued "individually and as [his or her

official title]."  (1st Am. Complt.)  The Second Circuit has allowed for the possibility that, where

a complaint does not specify that a government official is sued in his official capacity, the nature of

that defendant's liability may be determined after the pleadings stage.  *Ying Jin Gan*, 996 F.2d at

529-30.  Here, however, unlike in *Ying Jin Gan*, where the complaint was "silent as to the capacity

in which the individual defendants [were] sued," *id* at 529, the complaint asserts claims against each

of the individual defendants in his/her individual capacity, except Allers.  (1st Am. Complt.)

Further, this case is now past the pleadings stage and, while plaintiff appears to argue against qualified immunity for Allers in her brief, plaintiff has never sought to amend her Complaint to indicate an intent to sue Allers in anything but "his capacity as Commissioner of Social Services." (*Id.*)

We, therefore, decline to address the merits of defendants' arguments regarding qualified immunity as to Allers because we find that he has not been sued in his individual capacity.

### B.    David Garcia and Netter E. Thomas

Thomas carried out an investigation of plaintiff and memorialized her findings in a report that was presented to her supervisor, Garcia. DSS relied, in part, on that report in its petition for Jared's removal. The Second Circuit recognizes a need for "unusual deference in the abuse investigation context," finding that an investigation "passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse."[15] *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999) (internal citation omitted). Plaintiff alleges that Garcia and Thomas violated her rights to procedural due process, substantive due process and to be free from malicious prosecution, as well as Jared's right to be free from unreasonable search and seizure, as

---

[15]  The touchstone of the constitutional standard to be applied in a child removal case is "a reasonable basis for a finding of abuse," which standard is "undeniably close" to, and, thus, potentially difficult to disentangle from, the qualified immunity analysis, which also turns on reasonableness. *See Wilkinson*, 182 F.3d at 107, n.10 (commenting that some courts have found it "nearly impossible" to "separate the constitutional analysis from the immunity analysis"). In light of this, we emphasize that, in this motion, we decide only the question of qualified immunity, that is, the objective reasonableness of Thomas's and Garcia's actions, and not the merits of the underlying claims.

protected by the Fourth Amendment.[16]  We will analyze each of these claims separately.

### 1.       Procedural Due Process Claim

Procedural due process requires "a hearing prior to depriving a parent of custody or a prompt post-deprivation hearing if the child is removed under emergency circumstances," *Shapiro v. Kronfeld*, 2004 WL 2698889, at *12 (S.D.N.Y. Nov. 24, 2004) (internal quotation marks and citation omitted); this standard was clearly established at the time of the events giving rise to the instant suit. *Tenenbaum*, 193 F.3d at 596 (establishing the standard for procedural due process with respect to claims against caseworkers in child removal situations).

In *Kia P. v. McIntyre*, the Second Circuit addressed a child removal situation where a child was born in a hospital and, pursuant to state action, the hospital continued to hold the child after the hospital had medically cleared the child for release.  235 F.3d 749, 760 (2d Cir. 2000).  In *Kia P.*, the court held that the mother "placed her child in the care of a non-governmental actor [the hospital] when she gained admission to the [h]ospital and gave birth there."  *Id*.  The court reasoned that, "for the period between [the child's] birth and her medical clearance," there was no liability arising out of the hospital's refusal to release the child to her mother because, until issuance of a medical release, the hospital was holding the child for treatment and observation.  *Id*. at 757.  Only upon

---

[16]  Plaintiff also sues for wrongful custody.  (*See* 1st Am. Complt. ¶¶ 67-70.)  Neither plaintiff's First Amended Complaint nor her brief in opposition to this motion offer guidance with respect to which defendants she intends to sue for which claims.  Viewing the facts in the light most favorable to plaintiff, it appears that she brings her wrongful custody claim against Tilton and Woolsey (the foster care workers who oversaw Jared's foster care placement) and not against Thomas or Garcia, who never had custody of Jared.  (*See* Pls. Mem. Opp. Summ. J. at 17.)  Because we are now analyzing Thomas's and Garcia's defenses of qualified immunity, we address only the claims brought against them.

medical clearance did the hospital's holding of the child turn from a medical purpose to one relating to the state's action concerning child abuse and child welfare law. *Id*. (noting that a hospital is not a state actor when it merely provides medical care).

Thus, here, as in *Kia P.*, the procedural due process inquiry begins with Jared's medical clearance for release from the Hospital. If Jared was medically cleared for release and if, following such clearance, plaintiff was prevented from bringing Jared home because of an action taken by defendants, then we must determine if defendants met their "duty to initiate a 'prompt' post-deprivation hearing after" Jared was removed from the custody of plaintiff.[17] *Id*. at 760.

It appears from the record that the events in question occurred in the sequence indicated: DSS first notified the Hospital of its intention to place a hold on Jared at 9:45 a.m. on February 10, at the earliest. (*See* Pesavento 2/13/09 Aff. ¶ 5 ("the first reference . . . that there was a 'hold' on Jared [] is at 9:45 a.m. on February 10th"); *see also* Defs. Mot. Summ. J., Ex. Z (facsimile transmission sent at 11:28 a.m. on February 10,[18] from Garcia on DSS letterhead to the Hospital, providing "formal notice[] that [DSS is] placing an administrative hold on" Jared).) Whether this letter in fact constituted a removal, that is, whether plaintiff was prevented from bringing Jared home following

---

[17] As did the court in *Kia P.*, we analyze whether there was a prompt *post-deprivation* hearing because "[a] pre-deprivation hearing, which is required in non-emergency situations, . . . would have been extremely impractical in this case, because the Hospital already had custody of [Jared] at the moment [he] was medically cleared. At that point, the Hospital's custody of [Jared] became state action and a pre-deprivation hearing was no longer possible." *Id*. at n.4 (internal citation omitted).

[18] The date on this letter is "February 9, 2005," however, the "DATE, TIME" of transmission to the Hospital is "2/10 11:28." (Defs. Mot. Summ J., Ex. Z; *see also* Pesavento 2/13/09 Aff. ¶¶ 3, 6 (clarifying an earlier affidavit (Pesavento Undated Aff. ¶ 6), wherein the affiant mistakenly stated that the Hospital had received the letter on February 9, because she had seen only the February 9 date listed on the letter and had not seen the facsimile transmission date of "2/10").)

that letter, is not clear.  Plaintiff states that, on "the morning of February 10, 2005, [she] went to bring [Jared] home as [he] was medically clear[ed] to leave the [H]ospital, when [she] arrived [she] was informed [she] could not take him home because the defendants had removed him from [her] care and custody.  Later that morning [she] also received notice that there would be a hearing late in the afternoon that same day."  (S. Orlik Aff. ¶ 5.)  The Hospital records from February 10, however, indicate that plaintiff did not go to the Hospital that day.  (Defs. Reply Mem. Supp. Summ. J., Ex. CCC at 107 (Hospital records indicate that plaintiff called the Hospital at "21:00" and stated that it was "'the first [day] that [she had not] been in'" to the Hospital).)  Clearly, there is an issue of fact as to whether plaintiff went to the Hospital in an attempt to bring Jared home on February 10 and was prevented from doing so.  If she was not prevented from taking Jared home, then there was no removal prior to the February 10 Hearing and no procedural due process inquiry would be necessary.  However, because this is a motion for summary judgment and we view all evidence in the light most favorable to the non-moving party, we accept, for the purposes of this motion, that plaintiff was prevented from bringing Jared home on the morning of February 10.

We must next determine whether Jared was medically cleared to be released from the Hospital on the morning of February 10, so that plaintiff was prevented from bringing Jared home because of a state action and not because of the Hospital's medical treatment of Jared.  The Hospital medical records do not reflect any medical clearance for Jared prior to the February 10 Hearing.  (*See* Defs. Mot. Summ. J., Exs. A-B; *see also* Defs. Reply Mem. Supp. Summ. J., Ex. CCC.)  However, Pesavento and Thomas both stated that Jared was medically cleared for release on February 10.  (*See* Pesavento Undated Aff. ¶ 7; Pls. Mem. Opp. Summ. J., Ex. 4 at 7 (Thomas testified, during the February 10 Hearing, that Jared "was slated to leave [that day].").)  Viewing the evidence in the light

most favorable to plaintiff, as we must on this motion, we assume, for the purposes of this motion, that Jared was medically cleared for release from the Hospital as of the morning of February 10.

Because we have assumed, for purposes of this motion, that Jared was removed from plaintiff's custody on the morning of February 10, at a time when he was medically cleared to leave the Hospital, we must now determine whether plaintiff was provided with a prompt post-deprivation hearing. In viewing the evidence in the light most favorable to plaintiff, we further assume that: (a) plaintiff attempted to take Jared home from the Hospital as early as 9:45 a.m. on February 10, which is the earliest that the Hospital appears to have received notice that Jared was on hold; (b) plaintiff received notice of the February 10 Hearing two hours and fifteen minutes later, which is the latest time that plaintiff could have received notice in the morning (*see* S. Orlik Aff. ¶ 5 ("Later that morning[,] [plaintiff] also received notice that there would be a hearing late in the afternoon that same day."); and (c) plaintiff attended a hearing six-and-a-half hours after she was prevented from taking Jared home. (*See* Jackson Aff. ¶ 1 (The February 10 Hearing,[19] which resulted in the Family Court issuing an order granting temporary custody of Jared to DSS, was "calendered for 3:30 p.m. and commenced at 4:15 p.m.").)

We find that the delay between Jared's removal and the initiation of the February 10 Hearing did not violate plaintiff's clearly established constitutional right of procedural due process. Our holding, consistent with other courts in this circuit, which have held that a "short-lived and relatively

---

[19]  Plaintiff does not appear to argue that the February 10 Hearing was, itself, constitutionally insufficient. She does note that the removal order issued by the Family Court on February 10 was a "preprinted form order," (Pls. Mem. Opp. Summ. J. at 8), however, she does not argue that preprinted forms implicate due process concerns and our research has not revealed legal precedent holding that a preprinted form order violates due process. We, therefore, assume that the February 10 Hearing provided plaintiff with due process of law and address only whether it was initiated promptly, as required by procedural due process.

non-disruptive removal does not violate due process." *Shapiro*, 2004 WL 2698889, at *15; *see also*

*Cecere v. City of New York*, 967 F.2d 826, 830 (2d Cir. 1992) (a deprivation of custody lasting, at

most, four days is "brief" and does not violate due process); *and Taylor v. Evans*, 72 F. Supp. 2d

298, 308 (S.D.N.Y. 1999) (a four-day delay between a child's removal and a court hearing does not

violate due process). Jared's removal was "short-lived." At a maximum of six-and-a-half hours, it

falls well within the limits of constitutionally permissible periods of removal prior to a hearing. The

removal was also "non-disruptive." Jared remained, throughout the period of his removal, in the

same location that he had been up until that point: the Hospital. *See, e.g.*, *Shapiro*, 2004 WL

2698889, at *15 (while social services had "custody of the children, they continued to reside with

their father"). While plaintiff may have been prevented from taking Jared home, there is no

indication that she was prevented from seeing him or visiting him and, thus, Jared's "short-lived"

and "non-disruptive" removal was a maintenance of the status quo, pending judicial determination

of the proper course of action going forward.

Plaintiff has not established that Garcia or Thomas violated her constitutional right to

procedural due process and, therefore, Garcia and Thomas are entitled to qualified immunity on

those claims.


### 2.    Substantive Due Process Claim

"Substantive due process protects individuals from arbitrary government intrusions by

requiring a reasonable basis or justification for such action[]." *Velez v. Reynolds*, 325 F. Supp. 2d

293, 303 (S.D.N.Y. 2004). "'[O]nly the most egregious official conduct can be said to be "arbitrary

in the constitutional sense."'" *Tenenbaum*, 193 F.3d at 600 (internal citation omitted; alteration in

19

original).  The Second Circuit has held that brief separations of a child from his or her parent "generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." *Nicholson v. Scoppetta*, 344 F.3d 154, 172 (2d Cir. 2003); *see also Tenenbaum*, 193 F.3d at 600 ("There is no basis for us to hold that a temporary separation of [the child] from her parents in an effort to obtain assurance that she had not been abused would have been so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it."). In *Nicholson*, the court noted that brief removals do not pose a "'serious' constitutional question." 344 F.3d 172. Here, in keeping with Second Circuit precedent on this point, the alleged several-hour long removal of Jared, pending a judicial determination of whether removal was proper, does not rise to the level of a violation of substantive due process. For this reason, Garcia and Thomas are entitled to qualified immunity to the extent that plaintiff's claim is based on a violation of her right to substantive due process.

Further, even if the duration of Jared's removal could be viewed as long enough to raise substantive due process concerns, Garcia and Thomas would still be entitled to qualified immunity. Plaintiff alleges that Thomas's report contained inaccuracies, namely whether plaintiff misrepresented her use of drugs (S. Orlik Aff. ¶ 8) and whether plaintiff's mother "yelled at" plaintiff regarding plaintiff's drug use. (A. Orlik Aff. ¶ 2.) Assuming plaintiff's allegation is true, which we do for the purposes of this motion, then a portion of Thomas's report was faulty or incorrect. This alone, however, is insufficient to give rise to a violation of substantive due process. Where a case worker's action is "incorrect or ill-advised" or where an investigation is "faulty," such deficiencies do not rise to the level of an unconstitutional investigation, provided that the case worker's action

20

is "consistent with some significant portion of the evidence before [her]." *Bukovinsky v. Sullivan County Div. of Health & Family Servs.*, 2008 WL 191018, at *8 (S.D.N.Y. Jan. 16, 2008), *quoting Hollenbeck v. Boivert*, 330 F. Supp. 2d 324, 333 (S.D.N.Y. 2004) *and Wilkinson*, 182 F.3d at 106, 108 (internal quotation marks omitted).  Here, the undisputed facts indicate that a significant portion of the evidence before Thomas and Garcia supported a finding that Jared may have been in danger. Staff at the Hospital, including a nurse and two doctors, expressed concerns about plaintiff's ability to care for Jared, a police report indicated that Jared's putative father, with whom plaintiff continued to have a relationship, was violent and information regarding plaintiff's emergency room visits to two hospitals indicated that plaintiff demonstrated prescription-drug seeking behavior while pregnant and that she sought particular medication in spite of medical advice that such medications might endanger the fetus.  In light of this information, all of which Thomas considered in preparing her report, we cannot hold that the conclusion that Thomas and Garcia reached was so shocking, arbitrary or egregious as to violate substantive due process. While other evidence arguably may have suggested that Jared's removal was not necessary, for example the fact that neither plaintiff nor Jared tested positive for drugs (*see* Pls. Mem. Opp. Summ. J. at 5), the Second Circuit affords case workers unusual deference in their investigations of claims of abuse and has found a rational basis for abuse reports even where medical professionals have affirmatively stated that they did not observe evidence of abuse. *See Gottlieb v. County of Orange*, 84 F.3d 511, 515, 520 (2d Cir. 1996). It cannot be said, in this case, that Thomas or Garcia "ignor[ed] overwhelming exculpatory information or [] manufactur[ed] false evidence," so that their investigation and report violated due process. *Wilkinson*, 182 F.3d 104.  Therefore, Thomas and Garcia are entitled to qualified immunity with respect to plaintiff's claims that they violated her substantive due process rights.

21

### 3.   **Fourth Amendment**

Plaintiff also sues, on behalf of Jared,[20] for violation of Jared's Fourth Amendment rights. "The Fourth Amendment protects 'the people' from 'unreasonable searches and seizures,' also providing that 'no Warrants shall issue, but *upon probable cause*, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized.'" *Tenenbaum*, 193 F.3d at 602 (emphasis and alterations in original).  In the context of a child removal, "a court order is the equivalent of a warrant." *Id*.  In this case, the Family Court issued an order on February 10, 2005, shortly after 4:15 p.m.  (*See* Jackson Aff. ¶ 1 (The February 10 Hearing, which resulted in the Family Court issuing an order granting temporary custody of Jared to DSS, "commenced at 4:15 p.m.").)  As discussed in greater detail above, the record is not clear as to whether or when Jared was, in fact, removed.  However, for the purposes of this motion, we accept that Jared was removed from plaintiff's custody on the morning of February 10, 2005.  (*See supra*, Section II.C.1.)  Therefore, the Fourth Amendment inquiry examines the period from the morning of February 10, 2005, at which point Jared was removed without a court order, to shortly after 4:15 p.m. on February 10, from which point on defendants acted under the equivalent of a warrant (such period, the "Removal Period").

As a preliminary matter, we find that Jared's "on hold" status at the Hospital was a seizure triggering Fourth Amendment protections because, under the circumstances and pursuant to a

---

[20]  "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Tenenbaum*, 193 F.3d at 601, n.13 (internal quotation marks and citation omitted).  Thus, as Jared is the individual alleged to have been seized, he is the individual who maintains the cause of action against defendants and plaintiff, as his mother, has standing to bring it on his behalf. *Id*.  To the extent plaintiff brings a Fourth Amendment violation on her own behalf with respect to defendants' treatment of Jared, plaintiff has no clearly established constitutional right to bring such a claim.

government action, here, a letter from DSS, "a reasonable person would have believed that [Jared] was not free to leave." *Gardiner v. Incorporated Vill. of Endicott*, 50 F.3d 151, 155 (2d Cir. 1995) (internal quotation marks and citations omitted). We, therefore, turn now to the question of whether the warrantless seizure of Jared during the Removal Period was reasonable.

"Probable cause" is "descriptive of what seizures are 'reasonable' when, as here, no warrant has been obtained."[21] *Tenenbaum*, 193 F.3d at 602-03; *see also Nicholson*, 344 F.3d at 172 (Observing that "there is no Fourth Amendment violation committed by [] officials carrying out an *ex parte* removal where there was probable cause to believe that there existed facts to merit emergency removal under New York law."). Because Thomas and Garcia now invoke a qualified immunity defense, we do not determine whether there was, *in fact*, probable cause to seize Jared without a warrant equivalent, but whether Thomas and Garcia were reasonable in their belief that probable cause existed to support such a seizure. As described above, in the substantive due process analysis, while Thomas might have inaccurately reported the statements of plaintiff and her mother, Thomas and Garcia relied on information from a wealth of independent sources, including information regarding several visits to two hospitals and a police department, in their determination

---

[21]   "[T]here are some agencies outside the realm of criminal law enforcement where government officials have 'special needs beyond the normal need for law enforcement [that] make the warrant and probable-cause requirement impracticable.'" *Tenenbaum*, 193 F.3d at 603 (*citing O'Connor v. Ortega*, 480 U.S. 709, 720 (1987) (alteration added; alteration in original). The *Tenenbaum* court observed that "there is at least a hint in this Circuit, [] that probable cause is required of caseworkers seizing children without judicial authorization." *Id*. That court "refrain[ed] from deciding categorically . . . that the removal of a child of whom abuse is suspected is not a 'special needs' situation. There may be circumstances in which the law of warrant and probable cause . . . does not work effectively in the child removal . . . context." *Id*. at 604. We need not decide this issue in the context of this motion or whether the law on Fourth Amendment seizures was "clearly established" at the time of the events giving rise to this case because it was reasonable for Thomas and Garcia to believe that probable cause existed.

that plaintiff may pose a risk to Jared.  At the very least, caseworkers of "reasonable competence could disagree on the legality" of Thomas's and Garcia's actions and, therefore, they are entitled to qualified immunity to the extent plaintiff brings a Fourth Amendment claim, on behalf of Jared, against them.  *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995).  In rendering this decision, consistent with the jurisprudence in this circuit, we "emphasize [] the importance of the availability of qualified immunity where child welfare workers are seeking to protect children from abuse." *Tenenbaum*, 193 F.3d 605.

### 4.   **Malicious Prosecution**

Garcia and Thomas are also entitled to qualified immunity on plaintiff's claim of malicious prosecution.  Plaintiff was never subjected to criminal charges; rather, the claims brought against her were limited to civil proceedings in Family Court.  The question of when a civil proceeding in Family Court can give rise to a malicious prosecution claim is not clearly established.  *See Washington v. County of Rockland*, 373 F.3d 310, 315-16 (2d Cir. 2004) (While the Second Circuit has not "foreclose[d] the possibility that 'civil prosecution [could] give rise to a cause of action under § 1983,' we surmised that, absent official conduct that is conscience-shocking, 'it normally will not.'") (internal citation omitted; alteration added; alteration in original); *see also Garcia ex rel. Reyes v. City of New York*, 2004 WL 2187574, at *5 (E.D.N.Y. Sept. 28, 2004) ("The question of whether neglect proceedings in Family Court may give rise to a federal section 1983 claim for malicious prosecution is not fully resolved.") (internal citations omitted).  Given the state of the law on potential liability for malicious prosecution in a civil proceeding and, more specifically, a civil proceeding in Family Court, plaintiff has failed to state a claim of a violation of a clearly established

law against Thomas or Garcia. *Harlow*, 457 U.S. at 818; *see also Garcia v. Scoppetta*, 289 F. Supp. 2d 343, 354 (E.D.N.Y. 2003). Thomas and Garcia are, therefore, entitled to qualified immunity.

Further, even if the law on malicious prosecution in a civil proceeding in Family Court had been clearly established at the time of the events giving rise to this case, Thomas and Garcia would still be entitled to qualified immunity because, "[i]n order to prevail on a section 1983 claim for malicious prosecution, a plaintiff must show a violation of [her] rights under the Fourth Amendment . . . and establish the elements of a malicious prosecution claim under New York law." *Garcia*, 2004 WL 2187574, at *4, *citing Albright v. Oliver*, 510 U.S. 266 (1994) (citation altered) *and Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). In this case, plaintiff cannot establish the first element of a malicious prosecution claim against Thomas or Garcia because, as described in greater detail above, each is entitled to qualified immunity on her Fourth Amendment claim. Accordingly, they are entitled to qualified immunity on her malicious prosecution claim as well.

### C.   Ashley Tilton and Ann Woolsey

Tilton and Woolsey are employees of FCU at DSS; Tilton was the case worker who handled Jared's foster care placement and Woolsey was Tilton's supervisor. (Defs. Mem. Supp. Summ. J. at 29-30.) Neither Tilton nor Woolsey became involved in the instant case until the Family Court order placing Jared in foster care was issued.

Plaintiff claims that Tilton and Woolsey "continued the wrongful removal and refused to return the child to the care of his mother[,] . . . despite the new and additional information [DSS] was provided by Dr. David Hansen." (Pls. Mem. Opp. Summ. J. at 17.) The new and additional information to which plaintiff refers consists of letters, dated May 23, 2005 and July 5, 2005, written

by Dr. David Hansen, who had been evaluating plaintiff, and sent to Daniel L. Pagano, Esq., plaintiff's attorney. (*Id.*, Ex. 27.) There is no indication from the record that these two letters were ever sent to Tilton, Woolsey or any individual, apart from plaintiff's attorney. Further, plaintiff's contention that Tilton and Woolsey "colluded with the CPS workers to seek information to justify the wrongful removal of" Jared is unsupported by the record. (*Id.* at 17.) No evidence presented indicates that Tilton or Woolsey sought any information justifying Jared's placement in foster care or did anything more than carry out a Family Court order. (*Id.* at 17.)

Most importantly, notwithstanding any additional information that Tilton or Woolsey may or may not have had, it is undisputed that the Family Court issued an order mandating that Jared be placed in foster care. Had Tilton or Woolsey returned Jared to plaintiff, as plaintiff claims they should have done, such action would have been taken in direct violation of a Family Court order. Plaintiff has not cited any authority that stands for the proposition that a foster care worker who complies with a Family Court order acts in an objectively unreasonable way by doing so. We find that Tilton and Woolsey are entitled to qualified immunity because it was objectively reasonable for them to oversee Jared's foster care placement.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment for qualified immunity (Doc. #10) is granted with respect to Ashley Tilton, Ann Woolsey, Netter E. Thomas and David Garcia in their individual capacities and considered moot with respect to Robert B. Allers.

SO ORDERED.

Dated:  White Plains, New York
        March 16, 2009

                                    _____
                                    Sr. United States District Judge

27